**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1828**

MARVIN DUBON MIRANDA; AJIBADE THOMPSON ADEGOKE; JOSE DE
LA CRUZ ESPINOZA,

        Plaintiffs – Appellees,

v.

MERRICK B. GARLAND, Attorney General; ALEJANDRO N. MAYORKAS,
Secretary; MATTHEW T. ALBENCE, Deputy Director and Senior Official
Performing the Duties of the Director; DAVID L. NEAL, Director; JANEAN
OHIN, Acting Director; WILLIAM DELAUTER, Corrections Bureau Chief; JACK
KAVANAGH, Director; DONNA BOUNDS, Warden,

        Defendants – Appellants.

----------------------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; LEGAL AID JUSTICE
CENTER; THE ROUNDTABLE OF FORMER IMMIGRATION JUDGES;
AMERICAN IMMIGRATION LAWYERS ASSOCIATION-DC; AYUDA, INC.;
THIRTY SOCIAL SCIENCE SCHOLARS AND RESEARCHERS

        Amici Supporting Appellees.

Appeal from the United States District Court for the District of Maryland, at
Baltimore.  Catherine C. Blake, Senior District Judge.  (1:20-cv-01110-CCB)

Argued:  October 27, 2021            Decided:  May 12, 2022

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and Michael F. URBANSKI, Chief United States District Judge for the Western District of Virginia, sitting by designation.

———————

Vacated and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Richardson concurred in part and dissented in part, and Judge Urbanski concurred in part and dissented in part.

———————

**ARGUED:** Courtney Elizabeth Moran, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Carmen Gloria Iguina Gonzalez, AMERICAN CIVIL LIBERTIES UNION, Washington, D.C., for Appellees. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, William C. Peachey, Director, Samuel P. Go, Assistant Director, Susan M. Imerman, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Nicholas T. Steiner, Sonia Kumar, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland; Michael K.T. Tan, ACLU FOUNDATION IMMIGRANTS' RIGHTS PROJECT, New York, New York; Jenny Kim, Melody Vidmar, Adina Appelbaum, Claudia Cubas, CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, Washington, D.C.; Deborah K. Marcuse, Clare J. Horan, Austin L. Webbert, Whittney L. Barth, Lucy Zhou, Baltimore, Maryland, Saba Bireda, SANFORD HEISLER SHARP, LLP, Washington, D.C., for Appellees. Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, Dayna J. Zolle, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Constitutional Accountability Center. Andrew J. Ewalt, Amna Arshad, Justin C. Simeone, Andrew T. Bulovsky, Washington, D.C., Hannah Khalifeh, FRESHFIELDS BRUCKHAUS DERINGER US LLP, New York, New York; Simon Sandoval-Moshenberg, Rebecca Wolozin, Kristin Donovan, LEGAL AID JUSTICE CENTER, Falls Church, Virginia, for Amicus Legal Aid Justice Center. Madeline J. Cohen, Theodore A. Howard, WILEY REIN LLP, Washington, D.C., for Amicus The Roundtable of Former Immigration Judges. Rene Kathawala, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, for Amici Thirty Social Science Scholars and Researchers. Sam Bragg, ALSTON & BIRD LLP, Dallas, Texas, for Amici The Washington D.C. Chapter of the American Immigration Lawyers Association and Ayuda.

———————

QUATTLEBAUM, Circuit Judge:

8 U.S.C. § 1226(a) permits the Attorney General to detain aliens[1] pending their removal hearings. And the Attorney General has adopted procedures for making that discretionary decision. Under those procedures, an alien is given notice and three opportunities to seek release by showing they are neither a flight risk nor a danger to the community.

A district court determined that a class of aliens had a likelihood of establishing that those procedures violated the Due Process Clause of the Fifth Amendment of the United States Constitution. That court then issued a preliminary injunction ordering, on a class-wide basis, that to continue detaining an alien under § 1226(a), the government must prove by clear and convincing evidence that an alien is either a flight risk or a danger to the community. The district court also required immigration judges, again on a class-wide basis, to consider an alien's ability to pay any bond imposed and consider alternatives to detention.

However, under 8 U.S.C. § 1252(f)(1), the district court lacked jurisdiction to issue class-wide injunctive relief that enjoined or restrained the process used to conduct § 1226(a) bond hearings. As for the individual relief issued by the district court, the detention procedures adopted for § 1226(a) bond hearings provide sufficient process to

---

[1] We realize that the use of the term "alien" has been the subject of some debate. *See e.g., Martinez Rivera v. U.S. Att'y Gen.*, No. 20-13201, 2021 WL 2836460, at *7 (11th Cir. July 8, 2021). We use the term because Congress used it in the text of the applicable statutes, and the same term is used in the applicable regulations. Our use of the term "alien" is not intended to express any opinion, pejorative or otherwise, about the plaintiffs in this action or others challenging their detention under our immigration laws.

satisfy constitutional requirements. For that reason, the aliens are unable to establish a likelihood of success on their due process claims. Nor have they shown that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor or that an injunction is in the public interest. Therefore, we vacate the district court's preliminary injunction order.

## I.

### A.

The Immigration and Nationality Act permits detention of aliens pending the outcome of removal proceedings. 8 U.S.C. § 1226; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Separate provisions of § 1226 provide the government with authority to detain aliens. "Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings*, 138 S. Ct. at 837 (citation omitted). This section also gives the Attorney General discretion to release an alien from custody on either a monetary bond or conditional parole. *Id.* "Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under 1226(a)." *Id.* (emphasis in original). "Under § 1226(c), the 'Attorney General shall take into custody any alien' who falls into one of several enumerated categories involving criminal offenses and terrorist activities." *Id.* (citation omitted). Here, the challenge on appeal involves detention procedures under § 1226(a).

Even though the Attorney General may detain an alien during removal proceedings, the Act and the regulations adopted to implement its authority afford aliens three opportunities to seek release from detention. The first opportunity is with an immigration officer. *Id.* § 1225(a). An immigration officer is authorized to release the alien if the officer is satisfied that the alien is not a danger to the community or a flight risk. 8 C.F.R. § 236.1(c)(8). If the immigration officer decides to release an alien, the officer may set a bond or place conditions on the alien's release. *Id.* If an immigration officer denies bond, sets bond at an amount the alien believes is too high or sets alternative conditions to bond the alien contends are unreasonable, an alien may appeal the officer's bond determination to an immigration judge, giving the alien a second opportunity at release. *See* 8 C.F.R. §§ 236.1(d)(1), 1003.19(a), 1236.1(d)(1). A third opportunity comes if an alien is not satisfied with the immigration judge's decision. In that situation, an alien may appeal to the Board of Immigration Appeals for another review. 8 C.F.R. §§ 236.1(d)(3), 1003.19(f), 1236.1(d)(3). At each step in this process, the government requires the alien to prove that he or she is not a danger to the community or a flight risk. 8 C.F.R. § 236.1(c)(8); 8 C.F.R. § 1236.1(c)(8); *In re Guerra*, 24 I&N Dec. 37, 38 (BIA 2006).

B.

Marvin Dubon Miranda, Aijbade Thompson Adegoke and Jose de la Cruz Espinoza challenge the detention procedures under § 1226(a) outlined above. Miranda, a citizen of El Salvador, entered the United States illegally in 2009 and has been here since then. He was convicted of second-degree assault in 2012 and of driving under the influence in 2017. After a second driving under the influence conviction, the government detained Miranda

5

and commenced removal proceedings. Miranda requested a bond hearing where he was represented by counsel and presented letters in support of release from his family members, friends, coworkers and partner. But the immigration judge denied his bond request, concluding Miranda had not met his burden of showing that he was not a danger to his community. In denying bond, the judge relied on Miranda's prior convictions for driving under the influence and for second-degree assault.

Adegoke, a citizen of Nigeria, came to the United States in 2017 on a B2 Visa. After overstaying his visa, Adegoke was charged with theft at a grocery store. The state officials later dropped the charge but detained Adegoke until immigration officials could take custody of him. After the immigration officials refused Adegoke bond, he requested that an immigration judge review his bond denial. The immigration judge set bond at $15,000, but Adegoke claimed he could not afford to pay that amount.

Espinoza, a citizen of Mexico, came to the United States in 2008. Following an argument with his brother twelve years later, Espinoza was charged with two counts of second-degree assault and one count of malicious destruction of property valued at less than $1,000. After his arrest, the government transferred Espinoza from the county jail to an immigration detention center. At his bond hearing, where he, like Miranda, was counseled, an immigration judge set bond at $20,000 because of Espinoza's pending criminal charges.

## C.

Neither Miranda, Adegoke nor Espinoza appealed the detention decisions of their respective immigration judges to the Board of Immigration Appeals. Instead, they

petitioned the United States District Court for the District of Maryland for writs of habeas corpus claiming the government's procedures for conducting § 1226(a) bond hearings violated the Due Process Clause of the Fifth Amendment to the Constitution. They requested the following relief:

> declaratory and injunctive relief that prohibits further detention without a constitutionally adequate bond hearing—that is, a hearing in which the government bears the burden to prove by clear and convincing evidence that detention is necessary because the noncitizen is a danger to others or a flight risk, and that there is no condition or combination of conditions that will reasonably assure the noncitizen's future appearance and the safety of the community.

J.A. 17. They also requested an order that, "in setting conditions of release, the immigration court must consider the noncitizen's ability to pay in setting the amount of any bond and must consider the noncitizen's suitability for release on alternative conditions of supervision." J.A. 17. In addition to seeking relief as individuals, they sought class action relief by asking the district court to certify a class "defined as people who, now or at any future time, are detained pursuant to 8 U.S.C. § 1226(a), and either had or will have a bond hearing in the Baltimore Immigration Court in Baltimore, Maryland." J.A. 37. Finally, in addition to their constitutional claims, Miranda, Espinoza and Adegoke brought statutory claims alleging that § 1226(a) required the same procedural protections.

Miranda, Adegoke and Espinoza then moved for a preliminary injunction as well as for class certification. Before the district court ruled on these motions, Adegoke was released from detention after being granted asylum and Miranda was released after an

7

immigration judge granted his motion for relief from withholding.[2] Their release presented a potential issue of mootness. Miranda, Adegoke and Espinoza argued that, even though Adegoke's and Miranda's claims are moot, they can still serve as class representatives, because their standing relates back to the filing of the suit due to the inherently transitory nature of their claims.

### D.

Before determining whether Miranda, Adegoke and Espinoza were entitled to a preliminary injunction, the district court analyzed whether it had jurisdiction to hear their claims. First, the district court rejected the government's argument that it had no jurisdiction because Miranda, Espinoza and Adegoke, by suing in federal court rather than appealing the immigration judge's decision to the Board of Immigration Appeals, failed to exhaust their administrative remedies. The court determined that although federal regulations permitted Miranda, Adegoke and Espinoza to appeal the immigration judges' bond and custody determinations to the Board, administrative exhaustion was not required by statute. Then, the court examined the factors set forth in *McCarthy v. Madigan*, 503 U.S. 140 (1992), in considering whether to exercise its discretion to excuse Miranda, Espinoza and Adegoke's failure to exhaust their administrative remedies. Ultimately, the district court found that appealing to the Board would be futile in light of the Board's

---

[2] Adegoke's detention lasted approximately six months and Miranda's approximately five months.

decisions concerning detention under § 1226(a).[3] Therefore, it excused Miranda, Adegoke and Espinoza from exhausting their claims before the Board.

Next, the district court analyzed whether 8 U.S.C. § 1226(e) or § 1252(a)(2)(B) precluded its review. Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

Section 1252(a)(2)(B) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

---

[3] The district court cited *In re Guerra*, 24 I&N Dec. at 40, and *In re Adeniji*, 22 I&N Dec. 1102 (BIA 1999), as Board decisions holding that the alien bears the burden to show to the satisfaction of an immigration judge that they merit release on bond. The district court cited other unpublished Board decisions providing that an immigration judge "need not consider a noncitizen's ability to pay a set bond amount." *See* J.A. 959 (citing *In re Castillo-Cajura*, 2009 WL 3063742, at *1 (BIA Sept. 10, 2009), and *In re Sandoval-Gomez*, 2008 WL 5477710, at *1 (BIA Dec. 15, 2008)).

The district court found that neither statute precluded it from reviewing the claims at issue because the claims were not challenges to the Attorney General's discretionary judgment but instead constitutional and statutory challenges to detention procedures under § 1226(a).

After determining that it had jurisdiction to hear Miranda, Adegoke and Espinoza's claims, the district court considered their requested injunctive relief. It evaluated the likelihood of success of their constitutional claim by applying the procedural due process test found in *Mathews v. Eldridge*, 424 U.S. 319 (1976). In applying that test to the government's requirement that aliens bear the burden to prove they are not a risk of flight or danger under § 1226(a), the district court found that Miranda, Adegoke and Espinoza's liberty interests outweighed the government's interest in enforcing immigration laws. As to the standard of proof concerning detention, the court observed that the most common standard is clear and convincing evidence, and, in concluding that standard applied in bond hearings, the court emphasized that a lower standard of proof would inappropriately place an individual's liberty interest on the same footing as the government's interest in facilitating deportations. In considering an alien's ability to pay and alternative conditions of release, the district court emphasized that "[d]ue process requires that detention 'bear[s] [a] reasonable relation to the purpose for which the individual [was] committed.'" J.A. 968 (citations omitted). It then reasoned that "[f]ederal regulations and [the Board's] decisional law suggest that the purpose of § 1226(a) detention is to protect the public and to ensure the noncitizen's appearance at future proceedings." J.A. 968. The district court held that consideration of an alien's financial resources and alternatives to detention was necessary to ensure that detention was reasonably related to the purposes of § 1226(a). The court then

determined that the failure to consider those factors rendered detention decisions unconstitutional because "the purpose of . . . detention—the lodestar of the due process analysis—becomes less clear." J.A. 970. In sum, the district court found that Miranda, Adegoke and Espinoza's claims had a likelihood of success on the merits.

Continuing its preliminary injunction analysis, the district court found the requirement of irreparable harm was satisfied, because a "deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" J.A. 972 (citations omitted). Then, in considering the third and fourth requirements for obtaining a preliminary injunction, the district court noted "the balancing of the harm and the public interest merge when the government is the opposing party." J.A. 974. It found that the requested relief would have little impact on the government's ability to enforce immigration laws, that it is always in the public interest to prevent violations of constitutional rights and that the costs imposed on the government are outweighed by "preventable human suffering." J.A. 974.

Finally, the district court turned to the scope of relief. "Based on the court's finding that significant constitutional rights are at stake, and the risk of irreparable harm," the court issued "a class-wide preliminary injunction" granting the requested relief. J.A. 976–77. Further, since Espinoza remained detained, it ordered that he "receive a new bond hearing within 21 days."[4] J.A. 977. Since the district court granted Miranda, Espinoza and

---

[4] Espinoza received a new bond hearing pursuant to the district court's order. At that bond hearing, the immigration judge found that the government had met its burden to show that Espinoza was a flight risk but that such risk could be mitigated by ordering Espinoza to wear a GPS ankle monitor as a condition of release.

11

Adegoke's motion for a preliminary injunction on their constitutional claim, it did not address their statutory claim.

The government timely appealed the preliminary injunction order. The district court then denied the motion for class certification without prejudice for possible renewal after the conclusion of this appeal. We have jurisdiction to review under 28 U.S.C. § 1292(a)(1).

## II.

Before we can reach the merits of this appeal, we must first determine whether the district court had jurisdiction to hear Miranda, Adegoke and Espinoza's claims and to issue class-wide injunctive relief. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997) ("Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." (cleaned up)). As this inquiry is multi-faceted, we discuss jurisdiction at length. The government advances three arguments concerning jurisdiction: (1) Because Miranda, Adegoke and Espinoza failed to appeal their bond decisions to the Board, the district court lacked the authority to review the immigration judge's detention decision; (2) 8 U.S.C. § 1226(e) strips the courts of jurisdiction to review discretionary detention decisions like those at issue here; and (3) even if the courts have jurisdiction to consider the claims generally, 8 U.S.C. § 1252(f)(1) bars the courts from issuing class-wide injunctive relief concerning detention and bond issues under § 1226. We now address these arguments.

## A.

We first address the government's argument that Miranda, Adegoke and Espinoza were required to exhaust their administrative remedies by appealing the immigration judges' denial of bond to the Board. The government's entire argument is contained in a single footnote. Moreover, the government's argument in its footnote is cursory at best—it does not attempt to explain why the district court erred in concluding that Miranda, Adegoke and Espinoza were not required to appeal their bond determinations to the Board.

Normally, such scant treatment of an issue would constitute waiver. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015) (concluding that a party waives an argument when its discussion of that argument is limited to an isolated footnote). However, if the administrative exhaustion requirement relates to the district court's jurisdiction, the issue cannot be waived. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (holding that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived" (citations omitted)); *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020). Therefore, we must decide if the statutes, on which the government's failure-to-exhaust argument is based, are jurisdictional.

"The doctrine of administrative remedies is well established in the jurisprudence of administrative law . . . [and] provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States*, 395 U.S. 185, 193 (1969) (citations omitted). Congress may codify the doctrine as a jurisdictional bar, and "[w]here Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *see also*

13

*Weinberger v. Salfi*, 422 U.S. 749, 757 (1975). "But where Congress had not clearly required exhaustion, sound judicial discretion governs." *McCarthy*, 503 U.S. at 144; *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 518 (1982) (White, J., concurring) ("[E]xhaustion is 'a rule of judicial administration,' and unless Congress directs otherwise, rightfully subject to crafting by judges." (citations omitted)).

Following that guidance from the Supreme Court, we turn to the pertinent statutes regarding exhaustion in this context. The only provision cited by the parties regarding administrative exhaustion is 8 U.S.C. § 1252(d)(1). That provision provides that "[a] court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." § 1252(d)(1). Whether or not that provision is jurisdictional, it does not apply here since Miranda, Adegoke and Espinoza do not seek a review of a final order of removal. Instead, they challenge the constitutionality of detention procedures under § 1226(a).

The government has not pointed us to any other provision of the immigration laws where Congress clearly required exhaustion, and neither have we found one. Therefore, no statute applicable to Miranda, Espinoza and Adegoke's claims provides that administrative exhaustion is jurisdictional. For that reason, the district court had discretion to decide if administrative exhaustion was required. Moreover, unlike provisions that provide the courts with jurisdiction, challenges to a court's exercise of its discretion can be waived. *See United States v. Muhammad*, 16 F.4th 126, 130 (4th Cir. 2021) ("Because the requirement is not jurisdictional, it may be waived or forfeited.") Because the government

14

did not adequately address the district court's determination that administrative exhaustion was not required, the government waived this argument on appeal.

## B.

The government also argues that § 1226(e) precluded the district court from hearing these claims. As we stated earlier, § 1226(e) provides:

> The Attorney General's discretionary judgment regarding the application of [§ 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under [§ 1226] regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

According to the government, Miranda, Adegoke and Espinoza's claims in effect are challenges to the immigration judges' discretionary bond decisions because they would mandate what an immigration judge must consider at a bond hearing. They argue that § 1226(e) precluded the district court from reviewing such decisions.

The Supreme Court addressed this argument in *Jennings*, 138 S. Ct. at 841. There, the Supreme Court explained that "§ 1226(e) precludes an alien from challenging a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Id*. (cleaned up) (citing *Demore v. Kim*, 538 U.S. 510, 516 (2003)). However, it "does not preclude challenges to the statutory framework that permits the alien's detention without bail." *Id.* (cleaned up) (citing *Demore*, 538 U.S. at 517). In *Jennings*, aliens "challeng[ed] the extent of the [g]overnment's detention authority under the 'statutory framework' [of § 1226(c)] as a whole." *Id.* The Court explained the aliens also "contest[ed] the constitutionality of the entire statutory scheme under the Fifth Amendment." *Id.* Thus, it held "the extent of the Government's

15

detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision'" and is thus "outside of the scope of § 1226(e)." *Id.*

This case is different from *Jennings*. There, § 1226(c) expressly placed the burden of proof on the aliens. Thus, the appellant's challenge as to the burden of proof was an attack on § 1226(c)'s statutory framework. In contrast, § 1226(a) is silent on the burden of proof. As a result, the Attorney General had discretion to decide who to place the burden of proof on, and it placed it on the aliens. As such, the first sentence of § 1226(e)—"The Attorney General's discretionary judgment regarding the application of [§ 1226] shall not be subject to review"—at least if read by itself, would seem to foreclose jurisdiction. But we should not read that first sentence in isolation. *See NLRB v. Lion Oil Co.*, 352 U.S. 282, 288 (1957) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law."). The second sentence provides: "No court may set aside any action or decision by the Attorney General under [§ 1226] regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." That language clarifies the first sentence by explaining that subsection (e) refers to a specific act or decision regarding bond or parole decisions. And while the Attorney General's decision to adopt procedures placing the burden of proof on aliens detained under § 1226(a) may very well be discretionary, a constitutional challenge to its categorical, across-the-board nature, as opposed to the application of § 1226 to specific cases, is beyond the scope of § 1226(e).

Judge Richardson concludes that, rather than clarifying the first sentence, which specifies "discretionary judgment," the second sentence of § 1226(e) precludes judicial

16

review of two additional categories: "action[s]" and "decision[s]" of the Attorney General.[5] *Jennings*, admittedly, supports this interpretation. *See* 138 S. Ct. at 841. In contrast, *Nielsen v. Preap*, 139 S. Ct. 954 (2019) supports our conclusion. In examining whether § 1226(e) bars a challenge to § 1226(c), a plurality of the Supreme Court stated § 1226(e) "applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases." *Id*. at 962. True, that position did not garner the support of Justices Thomas or Gorsuch. But the dissenting justices did not object to Justice Alito's jurisdictional analysis. Since any one of the potential jurisdictional obstacles addressed there would have precluded judicial review, the dissenting justices must have agreed that § 1226(e) was not a bar. And while *Preap* involved § 1226(c), which expressly provides that the alien bears the burden of proof on detention, in contrast to § 1226(a), which leaves that decision to the discretion of the Attorney General, Justice Alito does not base his reasoning on this difference.

We recognize that reasonable minds might disagree if § 1226(e) precludes jurisdiction. This is a close question of statutory interpretation, and the Supreme Court decisions do not provide a clear answer. But for the reasons described above, we reject the

---

[5] If this were Congress' intent, there were clearer ways to indicate a list including discretionary judgment, actions and decisions. For example, Congress could have said, with respect to § 1226, there shall be no judicial review of (1) discretionary judgments, (2) actions or (3) decisions. But in fairness, Congress likewise could have used clearer language in drafting the second sentence to indicate that it clarifies the first. For example, it could have said, because of this absence of judicial review, no court may set aside any action or decision by the Attorney General under § 1226 regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole. Hence, we are left to attempt to interpret what Congress meant.

government's argument that we lack jurisdiction to consider these claims. Rather than creating three different categories, the two sentences of § 1226(e), when read together, show Congress sought to forbid review of the Attorney General's actions and decisions in individual proceedings.

The government counters that, at the very least, mandating the factors an immigration judge must consider, such as an alien's ability to pay and alternative bond conditions, infringes on an immigration judge's discretion. This is also a close call. But whether an immigration judge must consider certain factors is still a "constitutional challenge" to the procedures adopted by the Attorney General for all detention decisions under § 1226(a). As a result, § 1226(e) does not bar our review.[6]

---

[6] Although neither party advances these provisions, 8 U.S.C. § 1252(a)(2)(B)(ii) and (b)(9) also limit the courts' jurisdiction over immigration matters. We ordinarily limit our review to the arguments made by the parties. However, we are bound by the Constitution to ensure that we have, and the lower court had, jurisdiction over the claims at issue. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986). Beginning with § 1252(a)(2)(B)(ii), the Supreme Court held that § 1252(a)(2)(B)(ii) did not bar jurisdiction where the aliens "challenge[d] the extent of the Attorney General's authority under the post-removal-period detention statute," which "is not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Similarly, Miranda, Espinoza and Adegoke challenge the extent of the government's authority under § 1226(a) rather than a discretionary decision. Thus, under *Zadvydas*, § 1252(a)(2)(B)(ii) does not foreclose jurisdiction.

Section 1252(b)(9)'s jurisdictional limitation includes "interpretation and application of constitutional and statutory provisions." Even so, in *Jennings*, a majority of justices appear to have concluded that § 1252(b)(9) would not preclude review under these circumstances. *See* 138 S. Ct. at 841 (Alito, J., joined by Roberts, C.J., and Kennedy, J.) ("[R]espondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."); *id.* at 876 (Breyer, J., dissenting, joined by Ginsburg, J., and Sotomayor, J.) ("Jurisdiction also is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only '[w]ith respect to review of an order of removal under [§ 1252(a)(1)].'").

18

C.

Last, the government argues that 8 U.S.C. § 1252(f)(1) deprived the district court of jurisdiction to issue class-wide injunctive relief. In response, Miranda, Adegoke and Espinoza first argue that the government waived that argument by failing to raise it before the district court in opposition to their motion for a preliminary injunction. They contend that because § 1252(f)(1) is not jurisdictional, we can consider any argument dependent upon that section waived. And even if it was jurisdictional, Miranda, Adegoke and Espinoza argue that it simply does not apply to the district court's preliminary injunction.

However, echoing its argument concerning the exhaustion of administrative remedies, the government contends that § 1252(f)(1) implicates the court's subject-matter jurisdiction. As we discussed at length above, a court's jurisdiction "may be raised by a party at any time or by a court on its own initiative." *Hicks*, 965 F.3d at 310; *see also Arbaugh*, 546 U.S. at 514. Therefore, we must consider whether § 1252(f)(1) is a jurisdictional limit on the courts.

For two reasons, we conclude that § 1252(f)(1) is a jurisdiction-stripping statute. First, the text of § 1252(f)(1) provides:

(f) Limit on injunctive relief

(1) In general

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an

19

individual alien against whom proceedings under such part have been initiated.

By its plain terms, the provision restricts a court's "jurisdiction or authority to enjoin or restrain the operation of" the process used for detaining aliens under § 1226(a). This language is compelling evidence the section is jurisdictional in nature.

Second, the Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 474, 492 (1999), when considered in conjunction with other Supreme Court decisions involving statutes with similar language, provides strong evidence that § 1252(f)(1) is jurisdictional. There, aliens claimed that the Immigration and Naturalization Service (INS) "was selectively enforcing immigration laws against them." *Id.* at 474. In response to the INS's argument that § 1252(g) deprived the district court of jurisdiction, the circuit court had interpreted § 1252(g) to incorporate certain exceptions within § 1252, including subsection (f). The Ninth Circuit found § 1252(f) preserved federal jurisdiction. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 119 F.3d 1367, 1374 (9th Cir. 1997). The Supreme Court disagreed. In rejecting the circuit court's interpretation of § 1252(f) as a "jurisdictional grant," 525 U.S. at 481, it discussed the subsection's meaning:

> It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases. To find in this an affirmative grant of jurisdiction is to go beyond what the language will bear.

*Id.* at 481–82.

While it may be debatable as to whether *Reno* held that § 1252(f)(1) was a jurisdiction-stripping statute, § 1252(f)(1)'s "no court shall have jurisdiction" language is

20

the same language found in § 1252(g) and § 1252(b)(9). And the Supreme Court has held that both of those statutes strip the courts of jurisdiction. *See*, *Reno*, 525 U.S. at 492 (holding that "8 U.S.C. § 1252(g) deprives the federal courts of jurisdiction over respondents' claims"); *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2292 (2021) (Thomas, J., concurring) (citing § 1252(b)(9) as a Congressional measure to restrict the courts' jurisdiction).

In fact, two members of the Supreme Court have cited *Reno* as authority that § 1252(f)(1) limits a district court's jurisdiction to issue class-wide injunctive relief. *See Nielsen v. Preap*, 139 S. Ct. 954, 975 (2019) (Thomas, J., concurring, joined by Gorsuch, J.). And of our sister circuits that have addressed this issue, a majority agree that § 1252(f)(1) goes to jurisdiction. *See Brito v. Garland*, 22 F.4th 240, 250 (1st Cir. 2021) (holding that Supreme Court precedent clearly shows that § 1252(f)(1) prohibits a district court from issuing a class-wide injunction enjoining the operation of § 1226(a)); *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 12 F.4th 321, 336–37 (3d Cir. 2021) ("holding that § 1252(f)(1) prohibits class-wide injunctions"); *Hamama v. Adducci*, 912 F.3d 869, 877 (6th Cir. 2018) (holding that the Supreme Court's decision in *Reno* "unambiguously strips federal courts of jurisdiction to enter class-wide injunctive relief"); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that "§ 1252(f) forecloses jurisdiction to grant class-wide relief to restrain operation of §§ 1221–31 by any court other than the Supreme Court"); *but see Padilla v. ICE*, 953 F.3d 1134, 1149–51 (9th Cir. 2020) *rev'd on other grounds*, 141 S. Ct. 1041 (2021); *Grace v. Barr*, 965 F.3d 883, 908 (D.C. Cir. 2020).

Miranda, Adegoke and Espinoza advance two countervailing arguments that § 1252(f)(1) is not jurisdictional. First, they contend the heading of the section, "Limit on injunctive relief," indicates § 1252(f)(1) merely limits the courts' powers rather than strips courts of jurisdiction. We disagree. While perhaps relevant, a statute's heading is still far less instructive than its actual text. *Yates v. United States*, 574 U.S. 528, 559 ("'[T]he heading of a section cannot limit the plain meaning of the text.'") (Kagan, J., dissenting) (quoting *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012). And, if we are to consider the heading of § 1252(f)(1), we must also consider the heading of the title under which that section falls. The title's heading refers to "Judicial review," which implies that the statute addresses the courts' jurisdiction, not their remedial powers. At most, the heading of § 1252(f) and the title of § 1252 cancel each other out.

Second, Miranda, Adegoke and Espinoza argue that while § 1252(f)(1) uses jurisdictional language, it does not implicate the court's power to act. Rather, they argue the statute's "to enjoin or restrain the operation of" language indicates that it only limits the courts' remedial powers. They insist that language is not sufficiently clear to limit the district courts inherent, equitable powers. In support of this position, Miranda, Espinoza and Adegoke rely on the Supreme Court's decision in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), which cautions that "[j]urisdiction . . . is a word of many, too many, meanings." *Id*. at 90 (internal punctuation omitted) (citation omitted). However, § 1252(f)(1) is distinguishable from the statute in *Steel Co.* The statute there, 42 U.S.C.

22

§ 11046(c), created a private cause of action for violations of the Emergency Planning and Community Right-To-Know Act of 1986, whereas § 1252(f)(1) expressly takes away jurisdiction. Returning to the text, the statute provides that "no court (other than the Supreme Court) shall have jurisdiction." We are unpersuaded that Congress used the word jurisdiction in § 1252(f)(1) without meaning subject-matter jurisdiction.

Even though we conclude § 1252(f)(1) is jurisdictional, Miranda, Adegoke and Espinoza advance three arguments why it does not apply to the injunction issued by the district court *in this case*. First, they point out that, unlike § 1252(e)(1)(B), which explicitly refers to Rule 23 of the Federal Rules of Civil Procedure in limiting the certification of class actions, § 1252(f)(1) does not mention class actions specifically. The absence of such specific reference to class actions, they argue, means § 1252(f)(1) does not have the preclusive effect the government suggests. We disagree. Congress's explicit reference to Rule 23 in § 1252(e)(1)(B) does not mean it must include such language in every section for the section to apply to class actions. Section 1252(f)(1)'s language limiting the "jurisdiction and authority" of the courts to enjoin § 1226(a) only with respect "to an individual alien" is sufficiently clear to indicate that courts lack jurisdiction to issue class-wide injunctive relief with respect to the processes used to detain aliens under § 1226(a). And § 1252(f)(1) applies "[r]egardless of the nature of the claim or the identity of the party or parties."

Second, they argue that the district court's injunction does not enjoin or restrain the operation of § 1226(a). According to Miranda, Espinoza and Adegoke, § 1226(a) is silent as to what procedures are required in custody-determination hearings. Thus, they insist the

23

district court's injunction could not have enjoined or restrained its operation. Again, we disagree. The statute provides the government with discretion to determine whether to detain or release an alien facing deportation. And it leaves the process for making that decision to the Attorney General. Despite that, the district court ordered that the government must bear the burden of proof in justifying detention, and that an immigration judge must consider an alien's ability to pay and alternative conditions of supervision in setting bond. Requiring the government to justify a decision the statute gave it discretion to make and requiring immigration judges to consider factors the statute did not require them to consider enjoins and restrains the operation of the statute.

By way of analogy, assume the rules of football—as they do—permit a forward pass. Despite those rules, the referee later decides that a team must justify in advance its decision that a pass is a good idea. Before the referee's new rule, the team had discretion whether to run or throw the ball. After the referee's new rule, the team no longer has that discretion. Instead, it can throw the ball only if the referee agrees in advance to the pass play. In the same way, preventing the discretionary detention permitted under § 1226(a) when the detention does not comply with new judicially created rules enjoins and restrains the operation of the statute.

Last, Miranda, Adegoke and Espinoza contend that § 1252(f)(1) does not apply to this class action because each member of the class action falls within the provision's exception for "an individual alien against whom proceedings under [the immigration laws] have been initiated." Resp. Br. 45 (citing *Padilla v. ICE*, 953 F.3d 1134, 1149–51 (9th Cir. 2020), *vacated on other grounds by* 141 S. Ct. 1041 (2021)); *see also Jennings*, 138 S. Ct.

24

at 875 (Breyer, J., dissenting). According to Miranda, Adegoke and Espinoza, each class member is an individual alien against whom removal proceedings have been brought. Thus, they insist that § 1252(f)(1) is inapplicable to them because it only applies to injunctions that provide relief to persons not yet in removal proceedings.

This argument disregards the plain language of § 1252(f)(1). *Hamama*, 912 F.3d at 877 (holding the same "argument does violence to the text of the statute"). The exception clause in § 1252(f)(1) applies to "the application of such provisions to *an individual alien* against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Except for the part that pertains to Espinoza, the district court's order does not apply to "an individual alien." It applies to multiple aliens, since it applies in "all future bond hearings conducted in the District of Maryland for individuals held pursuant to 8 U.S.C. § 1226(a)." J.A. 947. And a class of individuals is no longer "an individual," it is a group. The only way to interpret § 1252(f)(1) in the way Miranda, Adegoke and Espinoza suggest is to judicially strike "individual" from the statute. But our responsibility is to interpret the laws Congress passes, not rewrite them. By its express terms, § 1252(f)(1) allows a court to issue individual relief, but it bars class-wide relief. *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1360 (D.C. Cir. 2000) ("Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied.").

To summarize, § 1252(f)(1) expressly precludes "jurisdiction or authority to enjoin or restrain" provisions of the immigration laws, including § 1226(a), on a class-wide basis. Despite this provision, the district court imposed class-wide limitations on the discretionary

25

detention decisions permitted under § 1226(a). Such an order is impermissible in light of § 1252(f)(1)'s jurisdictional bar. None of Miranda, Adegoke and Espinoza's arguments convince us that the district court had jurisdiction to issue the class-wide injunctive relief concerning the application of § 1226(a). Accordingly, we vacate that aspect of the district court's order.

D.

Since the district court lacked subject-matter jurisdiction to issue a class-wide preliminary injunction, we must determine whether immediate remand is appropriate or if there are any lingering issues on appeal that we may review. Aside from issuing class-wide injunctive relief, the district court's order also granted Espinoza individual relief. As we just discussed, § 1252(f)(1) does not bar a district court from issuing injunctive relief enjoining the process used to detain under § 1226 as it relates to an individual alien against

whom removal proceedings have been initiated. Thus, we may review the order as it pertains to Espinoza.[7]

III.

We now turn to Espinoza's due process claims, providing first the standard by which we review the district court's preliminary injunction order before turning to the merits of this appeal.

A.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We review a district court's grant of a preliminary injunction for an abuse of discretion.

---

[7] As if there were not enough already, an additional jurisdictional wrinkle is whether the government's supervised release of Espinoza rendered his claim moot. For several reasons, we conclude it did not. First, Espinoza's supervised release resulted from the district court's order that is the subject of this appeal. It would create perverse incentives if compliance with a district court's order, while appealing that order, mooted the appeal. Second, the district court's order here granted a preliminary injunction. Such preliminary relief only applies "during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Holding Espinoza's claim to be moot would transform success on a motion for a preliminary injunction to final relief. Third, the government "at any time may revoke a bond . . . authorized under [8 U.S.C. § 1226(a)], rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). As § 1226(b) does not provide any limiting conditions for revoking bond, revocation remains a matter of discretion for the government. And, if we were to agree with the government's arguments on appeal, and the government still believed Espinoza to be a danger to the community or a flight risk, it could rearrest Espinoza and require him to show he is neither a risk of flight nor a danger to the community before releasing him from custody. Thus, the preliminary injunction granted to Espinoza remains a live controversy.

27

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019).

An error of law is an abuse of discretion and thus "grounds for reversal." *Id.*

B.

With that standard in mind, we turn to the parties' dispute as to whether the procedures the government affords in § 1226(a) bond hearings violate the Constitution. Even though Espinoza received notice of the government-sought detention and three opportunities for bail, he claims the procedures adopted by the government to carry out § 1226(a) deny him due process. More specifically, he claims the process leading to detention is unconstitutional because the Attorney General places the burden of proof on him, adopts the preponderance of evidence standard and fails to require every immigration judge to consider either the alien's ability to pay any amount of bond assessed or alternatives to detention.

Espinoza characterizes his claims as a procedural due process issue, challenging what process the Constitution requires the government to provide in a § 1226(a) bond hearing. In analyzing Espinoza's claims below, the district court used the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Mathews* "requires consideration of three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

28

*Id.* at 335.[8] Both Espinoza and the government agree that the *Mathews* test governs. Furthermore, the First and Ninth Circuits have employed the *Mathews* balancing test to evaluate due process challenges to the procedures used by the government under § 1226(a). *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28 (1st Cir. 2021); *Singh v. Holder*, 638 F.3d 1196, 1208 (9th Cir. 2011). Therefore, we will apply it to Espinoza's due process claims.

1.

We begin with the private interest. Here, the district court correctly noted that the private interest at stake is freedom from detention, a liberty interest which "lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. In describing that interest, the district court cited to *Addington v. Texas*, 441 U.S. 418 (1979), which involved civil commitment. There, the Supreme Court held that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id*. at 427. But *Addington* involved detention of United States citizens whereas § 1226(a) involves detention of aliens awaiting removal hearings.[9]

---

[8] The *Mathews* balancing test has been the subject of some criticism. "The balance is simply an ad hoc weighing which depends to a great extent upon how the Court subjectively views the underlying interests at stake." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 562 (1985) (Rehnquist, J., dissenting). Nevertheless, it remains binding law.

[9] In addition to *Addington*, Espinoza cites to other cases including *Foucha v. Louisiana*, 504 U.S. 71 (1992), which also involved civil commitment, and *Santosky v. Kramer*, 455 U.S. 745 (1982), which involved the termination of parental rights. These cases also involve the process due citizens.

The requirements of *Addington*, which apply to the detention of citizens, do not apply in the context of immigration removal proceedings. Due process is not a one size fits all proposition. To the contrary, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Moreover, "[i]ts flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Id.*; *see also Landon v. Plascencia*, 459 U.S. 21, 34 (1982) ("The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances.").

This is particularly true in the immigration context. The Supreme Court has stated over and over that "'[i]n the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Demore*, 538 U.S. at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)); *see also Reno v. Flores*, 507 U.S. 292, 305–06 (1993) (quoting *Fiallo v. Bell*, 430 U.S. 787 (1977), in turn quoting *Mathews*, 426 U.S. at 79–80); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990) (citing *Mathews*, 426 U.S. at 79–80).

In addition to *Addington*, the district court relied on *Zadvydas*. There, the Supreme Court considered a due process challenge to the detention of aliens under 8 U.S.C. § 1231, which governs detention following a final order of removal. Despite the order of removal, the government was unable find a country that would accept the aliens. *Zadvydas*, 533 U.S. at 684–86. Thus, they remained in detention under § 1231, which provides that an alien "may be detained beyond the removal period" in the discretion of the Attorney General.

30

While the Court ultimately decided the case by interpreting the statute based on the doctrine of constitutional avoidance, it suggested that an alien's liberty interest was "strong enough to raise a serious question as to whether, irrespective of the procedures used, the Constitution permits detention that is *indefinite and potentially permanent*." *Id.* at 696 (internal citation omitted) (emphasis added).

But the Supreme Court subsequently confined *Zadvydas* to the narrow circumstances presented there—the likelihood of indefinite detention. In *Demore*, the Supreme Court considered whether 8 U.S.C. § 1226(c), § 1226(a)'s sister section, violated the Constitution's Due Process Clause. Unlike § 1226(a), § 1226(c) explicitly provides that aliens with prior convictions of certain crimes shall be detained pending their removal hearings. It permits such aliens to be released on bond but only if the alien establishes that he or she is not a risk of danger or a flight risk, and establishes that release of the alien "is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into a major criminal activity, or an immediate family member or close associate of a witness of a witness, potential witness, or person cooperating with such an investigation." § 1226(c).

In *Demore*, an alien argued that the Due Process clause prevents the categorical placement of that burden on the alien. The Supreme Court disagreed. While acknowledging that aliens have due process rights, the Court again made clear that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 521 (citations omitted). In rejecting the alien's claim, the Supreme Court first identified the problem § 1226(c) was

31

intended to address. "[I]n adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.* at 528. Then, the Court held that "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Id.* Rather, the Court asked whether the evidence before Congress supported the approach Congress took. "The evidence Congress had before it certainly supports the approach it selected even if other, hypothetical studies might have suggested different courses of action." *Id.* The Court refused to impose its own policy judgment on how best to ensure aliens' attendance at future removal proceedings. *See id*.

Also, and relevant to the district court's reliance on *Zadvydas,* the Supreme Court held that the due process concerns regarding post-removal hearing detention described in *Zadvydas* did not apply to detention pending the removal hearing. The Court distinguished *Zadvydas* by pointing out that the aliens there faced effectively unlimited detention under § 1231. *Id*. at 527. In contrast, the government's detention of aliens in *Demore* pending their removal hearing was "of a much shorter duration." *Id*. at 528.

Even though *Demore* involved detention under § 1226(c) rather than § 1226(a), the statutory language of § 1226(c) and the procedures adopted by the Attorney General under § 1226(a) are identically distinguishable from the procedures at issue in *Zadvydas*. Just as it was in *Demore*, detention under § 1226(a) is pending an alien's removal hearing.

Accordingly, just like in *Demore,* the detention here is of a much shorter duration than the indefinite and potentially permanent detention in *Zadvydas.*

In addition to *Demore*, *Jennings* confirms that *Zadvydas* should not be expanded beyond the context of the indefinite and potentially permanent detention involved there. In *Jennings*, an alien challenged his detention based on statutory grounds, specifically under §§ 1225 and 1226. 138 S. Ct. at 839. The Supreme Court rejected the alien's attempt to analogize his case to *Zadvydas*. The Court explained that *Zadvydas* involved a limitless detention, whereas detention under §§ 1225 and 1226 is for a specified period of time— the time it takes to conduct a removal hearing. *Id.* at 844, 846–48. After *Jennings* and *Demore*, *Zadvydas* has little bearing on the detention procedures at issue here.

In short, the district court failed to recognize and incorporate into its analysis Supreme Court precedent establishing that aliens are due less process when facing removal hearings than an ordinary citizen would have. This failure constitutes an error of law.

2.

The district court also erred in applying the second *Mathews* factor—the risk of an erroneous deprivation of the private interest through the procedures used and the probable value that additional or substitute procedures would reduce that risk. In fact, other than reciting the factor, the district court failed to analyze it at all. That alone justifies vacating the preliminary injunction order. But we will nevertheless consider Espinoza's arguments on this issue.

On appeal, Espinoza offers a litany of complaints about the procedures the government has adopted for § 1226(a) hearings. He complains that detention, with limited

33

visitation rights, prejudices an alien's ability to prepare for hearings. And although he was represented by counsel at his bond hearing, Espinoza adds that, with no constitutional right to counsel, aliens often go unrepresented at bond hearings. Espinoza continues that the burden placed on aliens requires the government to present little to no evidence that the alien is a danger to the community or a flight risk. Moreover, according to Espinoza, an alien is rarely given access to the government's evidence before a bond determination and documents are seldom translated into the alien's native language. Last, Espinoza points out that the resources and expertise that aliens have pales in comparison to those of the government.

For four reasons, these complaints fail to show how the current procedures result in erroneous deprivations of liberty or how the procedures Espinoza proposes will reduce erroneous detention decisions. First, complaints about the right to counsel, advanced notice of the government's position or access to evidence and documents translated into an alien's native language are separate procedural complaints from those Espinoza advances. If those procedures are problematic, they—rather than the burden of proof—should be the subject of Espinoza's challenge. Even if the government bears the burden of proof, that change would not alleviate Espinoza's concerns about a lack of counsel, an absence of notice of the government's position and a lack of access to evidence and documents translated into an alien's native language.

Second, while the parts of detention hearings about which Espinoza complains may be more favorable to the government, others are more favorable to him. For example, aliens should know as much or more than the government about their own criminal history, and

they should know more than the government about any mitigating evidence related to that history. They should also know more than the government about family or employment information, which could bear on their risk of flight and any danger they pose to the community. And, besides public records of criminal activity—which again, the aliens should know more about than the government—the government likely has very little information about how an alien entered the United States, how long an alien has remained in the United States and what the alien has been doing while in the United States. Thus, Espinoza fails to establish that the detention proceedings are tipped steeply in favor of the government.

Third, aliens already receive the fundamental features of due process—notice and an opportunity to be heard. *See Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (citations omitted)). The current procedures provide aliens detained by the government three separate opportunities to make their case concerning bond. The first of these opportunities, which occurs before an immigration officer, occurs almost immediately upon an alien being detained. The second opportunity for bond, a hearing before an immigration judge, often occurs soon thereafter. At that hearing, an alien has an opportunity to present evidence that he or she should be released, including through witnesses and documents. And aliens can be, and often are, represented by counsel at such hearings. As a third opportunity, if still denied bond, the alien may immediately appeal that decision to the Board.

In addition, immigration judges and the Board have the guidance of a list of factors outlined in the agency's decision in *In re Guerra*[10] to utilize in determining whether bond is warranted and under what conditions. These factors provide a non-exhaustive, but flexible menu of considerations relevant to detention decisions. Despite Espinoza's complaints, these procedures provide substantial process.

Fourth, the additional process Espinoza seeks conflicts with Supreme Court precedent in similar circumstances. Consider first Espinoza's claim that the burden of proof should be on the government to prove, by clear and convincing evidence, that an alien is a risk to abscond or a danger to community safety. This argument is based on the notion that categorical detention is improper. According to Espinoza, individualized assessments, where the government bears the burden of proof, are required. But the Supreme Court has determined that several statutory procedures that presume detention categorically do not

---

[10] The factors in determining risk may include any or all of the following:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States."

*In re Guerra*, 24 I&N Dec. at 40; *see also* 8 C.F.R. § 1003.19(d) ("The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or Service.").

offend the Constitution. *See Carlson v. Landon*, 342 U.S. 524, 542–44 (1952) (mandatory detention of aliens who were communists or anarchists); *Demore*, 538 U.S. at 531 (§ 1226(c)'s presumption of detention for aliens convicted of certain crimes pending their removal hearings); *Flores*, 507 U.S. at 315 (the categorical requirement that minor aliens only be released to relatives or certain approved guardians).

Moreover, the Bail Reform Act, which the Supreme Court has held to be constitutional, also supports this conclusion. *See United States v. Salerno*, 481 U.S. 739, 755 (1987). It "allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . the safety of any other person and the community.'" *Id.* at 741 (alteration in original) (quoting 18 U.S.C. § 3142(e)). But the government does not bear the burden of proof in every bail hearing. Sections 3142(e)(2) and (3) create rebuttable presumptions for certain arrestees that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e)(2), (3). For example, a person convicted of a prior federal offense, if it is an offense listed under § 3142(f)(1), such as an offense for which the maximum sentence is life imprisonment or death, would face this rebuttable presumption. Moreover, arrestees face this presumption if the judicial officer finds there is probable cause to believe they committed certain drug offenses, *see id.* § 3142(e)(3)(A); committed firearms offenses, serious crimes in a foreign country, or terrorism, *see id.* § 3142(e)(3)(B); engaged in peonage, slavery, or trafficking in persons, *see id.* § 3142(e)(3)(D); or committed certain offenses involving a minor victim, *see id.* § 3142(e)(3)(E).

37

In each of these circumstances, the flip of the burden occurs "if the judicial officer finds that there is probable cause *to believe* that the person committed" the offense, thus the presumption shifts from the government to the arrestee before the arrestee is convicted. *See id.* § 3142(e)(3) (emphasis added). Even more telling, the rebuttable presumption applies to everyone, even citizens who are subject to an arrest. *See id.* § 3142(a) (noting that the statute applies to "persons"). If, in the criminal context, requiring citizens to bear the burden to show that they are not a danger to the community and a flight risk is not unconstitutional, it cannot be unconstitutional for the government to place a similar burden on an alien facing removal proceedings, especially considering the detention lasts only until removal.

Consider next Espinoza's argument that immigration judges must consider an alien's ability to pay any bond amount and alternative measures to detention to ensure aliens do not abscond before their removal hearings. Espinoza provides no specific evidence of incorrect deprivations of liberty under the current procedures that would be eliminated by the procedures he advances. Instead, his argument seems to be that the current procedures cast too wide a net, and that the proposed procedures constitute less burdensome means of achieving the government's goals. But even if Espinoza is correct on this point, the Supreme Court has instructed us that is not the proper analysis for deportable aliens. *Demore*, 538 U.S. at 528 ("[W]hen the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal."). In § 1226(a), Congress provided the

38

government with discretion to determine when to grant an alien bond.[11] It did not mandate the factors that must be considered in determining whether to grant bond. And it also provided three opportunities for aliens to make their case that they should be released. That process is more than sufficient to address any overbreadth concerns with the current process. Requiring the procedures Espinoza requests would in effect be constitutionalizing immigration policy decisions. That is not our job.

In sum, the district court failed to even analyze whether the current procedures used in § 1226(a) bond hearings carry risks of an erroneous deprivation of liberty or whether different detention procedures would mitigate such risks. And Espinoza's arguments to us on appeal conflict with guidance from the Supreme Court.

3.

Finally, the third *Mathews* factor is the government's interest in using the current process, including the burdens it would incur in using additional or substitute process. The district court erred in applying it as well.

The district court only considered the financial costs to the government of the additional procedures. It held that those financial costs were outweighed by an alien's liberty interests in not being detained. That analysis fails to even identify, much less

---

[11] Congress set a minimum bond amount of $1,500. 8 U.S.C. § 1226(a)(2)(A). We normally "assume [Congress] legislates in light of constitutional limitations." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) (citations omitted). A categorical minimum bond amount suggests that due process does not require immigration judges to consider an alien's ability to pay because setting a minimum amount necessarily denies bond to at least some aliens who could not pay bond set at $1,500.

address, the government's other interests in the current procedures, especially its control over matters of immigration.

In determining what process is due in a matter relating to immigration, "it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)). And Congress has repeatedly shown that it considers immigration enforcement—even against otherwise non-criminal aliens—to be a vital public interest, so vital that it has tried to cabin judicial review of immigration enforcement. *See, e.g.*, 8 U.S.C. §§, 1226(a), 1226(e), 1252(f)(1).

Importantly, during the deportation process, that government interest includes detention. Over one hundred years ago, the Court stated deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). As evident from *Flores* and *Demore*, this principle runs through Supreme Court immigration cases since that time. The district court erred by not identifying, and thus not considering, the government's significant interest in detaining aliens pending their removal hearings.

C.

When we consider applicable Supreme Court authority in reviewing the district court's application of the *Mathews* test, we conclude that the district court erred because Espinoza did not meet his burden to show a likelihood of success on his claim that requiring an alien in a § 1226(a) bond hearing to show, by a preponderance of evidence, that he is not a danger to the community nor a flight risk violates an alien's rights under the Due Process Clause. Espinoza also failed to meet his burden to show a likelihood of success on his claim that due process requires immigration judges in § 1226(a) bond hearings to consider an alien's ability to pay and alternative conditions on release. Aliens facing removal proceedings, although entitled to due process under the Constitution, are not entitled to the same process as citizens. The government has a significant interest in maintaining the current procedures, which already provide an alien three different opportunities to receive bond. The alien's burden of proof is only to show, by a preponderance of the evidence, that he or she is not a danger to the community or a flight risk. Those procedures, for individuals already in the country unlawfully, do not violate the Constitution's Due Process Clause.

As for the other factors of the preliminary injunction analysis, Espinoza fails to show they weigh in favor of a preliminary injunction. The district court premised its finding that Espinoza would suffer irreparable harm absent injunctive relief, the second factor, on its finding of a likelihood of success on the merits on his due process claim. The district court correctly noted that a deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

41

(1976). But as we have discussed above, the district court erred in finding that Espinoza had demonstrated a likelihood of success on his claim that he was denied due process during his bond hearing. Without his alleged constitutional injury, Espinoza has failed to show that he will suffer irreparable harm.

The district court also erred in concluding that factors three and four, the balance of the equities and the public interest, weighed in favor of granting a preliminary injunction. Those factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *cf. id*. at 434 (noting the "substantial overlap" between the factors governing the tests for granting a party a stay and for granting a preliminary injunction and noting that the last two factors for granting a stay merge when the government is an opposing party). Here, the district court's preliminary injunction order mandated a broad change in the government's policy of detaining aliens pending removal proceedings. The preliminary injunction effectively requires the government to bear the burden to prove that an alien in a removal proceeding is not a flight risk nor a danger to the community, even when the government may know nothing about the alien. The injunction also infringes upon the discretion of the Attorney General to allow immigration judges to decide which factors are relevant in determining if an alien is entitled to bond, and, if so, how much bond should be imposed. The enforcement of our immigration laws is the government's "sovereign prerogative," *Rusu v. INS*, 296 F.3d 316, 320 (4th Cir. 2002), and "detention is necessarily a part of [the removal] procedure," *Carlson*, 342 U.S. at 538. The balance of the equities and public interest do not weigh in favor of the sea change in bond hearings that Espinoza desires.

42

To be sure, we review a grant of a preliminary injunction for abuse of discretion. But, as noted above, the district court's analysis contained errors of law at each stage of the *Mathews* analysis which, in turn, infected its consideration of the preliminary injunction factors. Considering the preliminary injunction factors without these legal errors, none favor granting such an injunction.

We recognize that our decision conflicts with decisions from two of our sister circuits. In *Hernandez-Lara*, the First Circuit held that "in order to continue detaining [an alien] under section 1226(a), due process requires the government to either (1) prove by clear and convincing evidence that she poses a danger to the community or (2) prove by a preponderance of the evidence that she poses a flight risk." 10 F.4th at 41. But like the district court, the *Hernandez-Lara* court disregards more than a century of case law providing that aliens are not subject to the same due-process protections as ordinary citizens. And the Ninth Circuit's *Hernandez v. Sessions* decision, 872 F.3d 976, 990–91 (9th Cir. 2017), which concluded that due process required immigration judges in § 1226(a) bond hearings to consider a detainee's financial circumstances as well as possible alternative release conditions, suffers from the same flaws. In equating the due-process rights of aliens with that of citizens, it relied upon criminal cases involving citizens, and *Zadvydas*, which the Supreme Court, as we have already discussed, cabined to the context where a statute would "permit[] *indefinite* detention of an alien." 533 U.S. at 690 (emphasis added). Further, like the district court here, the Ninth Circuit brushed aside the significant process provided by the current procedures and the third *Mathews* factor—the government's interest in maintaining its current procedures—when the government has a

43

significant interest. *See Hernandez*, 872 F.3d 976 at 994. Thus, we decline to follow the First and Ninth Circuits on these issues. Instead, we agree with the Third Circuit's view of the burden of proof procedures in § 1226(a). While arguably in dicta, it stated "we perceive no problem with" the alien bearing the burden of proof under § 1226(a). *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F. 3d 274, 279 (3d Cir. 2018).

IV.

For the reasons outlined above, we vacate the district court's order granting a preliminary injunction and issuing class-wide relief. Section 1252(f)(1) strips courts of jurisdiction to award such relief. Likewise, we vacate the district court's order granting Espinoza a preliminary injunction because Supreme Court precedent establishes that the current procedures used for detention under § 1226(a) satisfy due process. Since the district court did not address Espinoza's statutory claim, we remand this case to the district court for further proceedings consistent with this decision.

*VACATED AND REMANDED*

RICHARDSON, concurring in part, dissenting in part, and concurring in the judgment:

While I largely agree with Judge Quattlebaum's analysis, I disagree that federal courts have jurisdiction to review this issue given 8 U.S.C. § 1226(e).

Section 1226(e) deprives federal courts of jurisdiction to review the Attorney General's discretionary judgment in applying § 1226: "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." This is clear jurisdiction-stripping language. It precludes any "review." It is at least as clear—if not more so—than jurisdiction-stripping language in other contexts. *Compare* 8 U.S.C § 1226(e) ("shall not be subject to review."), *with* U.S. Const. amend. XI ("shall not be construed to extend to any suit"), *and* 28 U.S.C. § 1604 ("a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States . . . "). The question then is whether the challenge here is to an exercise of the Attorney General's "discretionary judgment." If so, then this clear jurisdiction-stripping provision will do what it's meant to.

So we must consider whether setting bond-hearing procedures is an exercise of the Attorney General's discretionary judgment. While the statute itself mentions the use of "bond[s]," it is silent about how bonds are to be set. Section 1226 provides some detail about the conditions of the bonds: There is a minimum dollar amount ($1,500), but otherwise conditions are left up to the Attorney General. § 1226(a)(2)(A). Section 1226 also provides some detail about revoking the bonds: The Attorney General can revoke a bond "at any time." § 1226. But again, there is nothing at all about the bond-hearing

45

procedures—nothing but silence. There are strong reasons to believe this silence places procedural decisions in the Attorney General's discretion.

Silence on an issue so central to the statutory scheme suggests it is delegated to the implementing agency's discretion. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). And the Executive is given exceptional leeway in implementing immigration statutes. *Carlson v. Landon*, 342 U.S. 524, 542 (1952) ("Congress can only legislate so far as is reasonable and practicable, and must leave to executive officers the authority to accomplish its purpose"). Perhaps this is because both political branches have extraordinary power in the immigration context that predates the Founding. So while some immigration authority may be delegated from Congress, some authority is inherent in the Executive branch. *See Fong v. United States*, 149 U.S. 698, 709 (1893) ("In England, the only question that has ever been made in regard to the power to expel aliens has been whether it could be exercised by the king without the consent of parliament. . . . Eminent English judges, sitting in the judicial committee of the privy council, have gone very far in supporting the exclusion or expulsion, by the executive authority of a colony, of aliens . . . .").

And this statute is set against a backdrop of legal authority that says "agencies should be free to fashion their own rules of procedure." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978)); *cf.* 5 U.S.C. § 553 (excepting "rules of agency organization, procedure, or practice" from the requirements of notice-and-comment

rulemaking). Freedom to set procedures is another way of saying discretion to set procedures.

In sum then, the statute says nothing on this issue; statutory silence is often a grant of discretion; and here that silence falls on the question of agency procedure, which is normally left to the discretion of the agency. So choosing the bond procedures is an act of discretionary judgment by the Attorney General.

And § 1226(e) applies to *any* exercise of "discretionary judgment" by the Attorney General about the application of § 1226. The scope of "discretionary judgment" in the first sentence is not limited by the second sentence's ban on courts setting aside any "action or decision": "No court may set aside any *action or decision* by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." § 1226(e). This second sentence bars review of any "action or decision" by the Attorney General even if it is not a discretionary one. Read together, these two sentences provide three areas where judicial review "shall not apply" under § 1226: (1) discretionary judgments, (2) actions, or (3) decisions. *See Jennings*, 138 S. Ct. at 841 (drawing out these three distinct categories). While those categories may sometime overlap, they are not two ways of saying the same thing. Not only does this interpretation reflect the plain language, it also avoids making the first sentence of § 1226(e) surplusage. *See Yates v. United States*, 574 U.S. 528, 540 (2015); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Ore.*, 515 U.S. 687, 698 (1995).

Even though there is significant overlap between these sentences, this isn't merely a belt-and-suspenders approach. The Attorney General will sometimes act or make

decisions that are not subject to his discretionary judgment, such as mandatory detention actions under § 1226(c). And as is the case here, the Attorney General can apply his discretionary judgment to issues that are not "action[s] or decision[s] . . . regarding the detention or release of any [particular] alien." The two sentences in § 1226(e) thus preclude judicial review of two meaningfully different categories of agency action and should be read separately. And, because the Attorney General's judgment about the procedures for bond hearings falls in the discretionary-judgment category, we cannot review it, and neither can the district court.

It is true that *Demore v. Kim* and related cases teach that § 1226(e) "does not preclude challenges to the statutory framework." Maj. Op. at 15 (quoting 538 U.S. 510, 517 (2003); *see also* Dis. Op. at 56 n.1 (agreeing § 1226(e) does not deprive us of jurisdiction). But, as the majority recognizes, this is not a challenge to the statutory framework. And *Demore*'s holding does not mean that § 1226(e) fails to preclude constitutional challenges to the Attorney General's authority under § 1226(a) just because the challenge is to a "categorical" and "across-the-board" discretionary decision. Maj. Op. at 16.

*Demore* and related cases deal with § 1226(c), which addresses mandatory detention prescribed by the statute.[1] So challenges to that § 1226(c) framework focus on Congress's

---

[1] To the extent that the majority relies on specific language from *Jennings* or *Preap*, we should note that, besides not addressing the exercise of the Attorney General's discretionary judgment as here, neither *Jennings* nor *Preap held* anything about § 1226(e). Justices Gorsuch and Thomas did not join in Justice Alito's discussion of § 1226(e), and so there was only a 3-judge plurality addressing the issue. *Jennings v. Rodriguez*, 138 S. (Continued)

judgment. They are "constitutional challenge[s] *to the legislation*," i.e., to the statutory framework, and not to decisions by the executive enforcing that legislation. *Demore*, 538 U.S. at 516–17 (citing *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999)). In contrast, this challenge addresses "the Attorney General's discretionary judgment" about how to implement the statutory framework, even if that implementation is categorical and across-the-board.[2] So *Demore* and related cases do not resolve this case. And so we must follow the plain words of § 1226(e), which bars review of the Attorney General's discretionary judgments and includes no exception for categorical constitutional challenges. As inferior courts, we derive our "jurisdiction wholly from the authority of Congress," and that "body may give, withhold, or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution." *Kline v. Burke Const. Co.*, 260 U.S. 226, 234 (1922). And where Congress precludes judicial review we must respect that, even for Constitutional questions. *See Ex parte Kearney*, 20 U.S. 38, 42 (1822) (refusing to correct an alleged Fifth Amendment violation because Congress had not authorized writ of error review in criminal cases).

---

Ct. 830, 852 (2018). And the same is true about *Nielsen v. Preap*, 139 S. Ct. 954, 956 (2019). But even if there had been a majority opinion, it would be distinguishable on the same grounds as *Demore*.

    [2] This disagreement with my colleagues may come back to our disagreement about the separateness of the two sentences of § 1226(e). I concede that the second sentence focuses on particularized actions or decisions because it says, "any action or decision . . . regarding . . . any alien," which is naturally read to leave out categorical decisions. You might read it as saying "any [*individual*] action or decision." But I do not agree that this understanding should be transferred to the previous sentence. "Discretionary judgments regarding the application of this section" will often be made categorically, as here. So I disagree that across-the-board discretionary judgments are beyond the scope of § 1226(e). *See* Maj. Op. at 16.

Because § 1226(e) bars judicial review of any "discretionary judgment"—including those that apply to all detention decisions under § 1226(a) and those alleged to violate the Constitution—I disagree with my colleagues and would dismiss for a lack of jurisdiction on that basis.

That disagreement does not preclude me from joining in striking down the class-wide injunction under § 1252(f)(1). Section 1252(f)(1), like § 1226(e), presents a jurisdiction bar, and courts can of course resolve jurisdictional failings in any order. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."). And I agree that it forecloses the district court's grant of a class-wide injunction here. So I join in the portion of the opinion striking down the class-wide injunction on that ground.

But that still leaves the individual relief provided by the district court. On that front, I find myself in the strange situation in which I alone would dismiss for a lack of jurisdiction, but my colleagues disagree on the merits issue they together agree on reaching. So the question becomes: "How then are we to reach a judgment?" *Massachusetts v. E.P.A.*, 415 F.3d 50, 60 (D.C. Cir. 2005), *rev'd*, 549 U.S. 497 (2007) (Sentelle, J., dissenting in part and concurring in the judgment). In a situation like this, it is proper to accept the majority's jurisdictional ruling and reach the merits to ensure a judgment will issue. *Id.* at 61 (Sentelle, J., dissenting in part and concurring in the judgment) (citing *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2660 (2004) (Souter, J., concurring)); *see also Preap*, 139 S. Ct. at 962–965, 973 (Justices Thomas and Gorsuch did not join in the jurisdictional threshold inquiry but joined in the ensuing merits section); *Bragdon v. Abbott*, 524 U.S.

50

624, 656 (1998) (Stevens, J., concurring).  So although I disagree with my colleagues about § 1226(e)'s jurisdictional bar, I accept their decision on that issue.  From there, I join Judge Quattlebaum in the issuance of a judgment that's closest to the one I would issue.

*         *         *

For decades, Congress and the Executive have seen their efforts to enforce immigration laws stymied by drawn-out judicial proceedings.  Finally, they tried to solve the issue by setting significant limits on our jurisdiction.  As courts of limited jurisdiction which have only the power granted to us by Congress, we must respect these limits.  The district court here failed to do so.  And as Judge Quattlebaum notes, it also failed to recognize the crucial distinction between the constitutional rights afforded to citizens and the rights afforded to those illegally in our country.  While I disagree as to whether 8 U.S.C. § 1226(e) bars review, I concur in the rest of his opinion and—given the unusual disposition in this case—concur in the judgment.

URBANSKI, concurring in part and dissenting in part, and dissenting from the judgment:

I join Parts II.A. and II.B. of the majority opinion, agreeing that the government waived the exhaustion argument on appeal and that 8 U.S.C. § 1226(e) does not bar review.

I respectfully disagree with the majority opinion's conclusion in Part II.C. that 8 U.S.C. § 1252(f)(1) deprives the district court of jurisdiction over all of the class-wide relief sought by plaintiffs. While the Supreme Court has not directly addressed this issue, the majority opinion concludes that § 1252(f)(1) precludes class-wide injunctive relief. But plaintiffs also sought class-wide declaratory relief, which was not addressed below, perhaps because the government failed to raise § 1252(f)(1) at the district court. As such, I would remand the case to the district court to allow it to address plaintiff's request for class-wide declaratory relief, which is not barred by § 1252(f)(1).

I respectfully dissent from Part III of the majority opinion. In my view, the Due Process Clause of the Fifth Amendment requires the government to bear the burden of proof in an immigration detention proceeding.

## I.

"No one disputes that the Fifth Amendment entitles noncitizens to due process of law." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993); U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .")). The Due Process Clause covers noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews*

52

*v. Diaz*, 426 U.S. 67, 77 (1976). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993) (citing *The Japanese Immigrant Case*, 189 U.S, 86, 100–01 (1903)). "At the same time, however, [the] Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process. As we said more than a century ago, deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Noncitizens are entitled to challenge the legality of their detention through habeas corpus review. *Boumediene v. Bush*, 553 U.S. 723, 771 (2008).

Each of the three plaintiff noncitizens were detained in Immigration and Customs Enforcement ("ICE") custody in Baltimore at the time suit was filed. Marvin Dubon Miranda, of El Salvador, had been in the United States for over ten years prior to his detention. Dubon Miranda was taken into ICE custody on December 12, 2019, and was represented by counsel at his bond hearing before an Immigration Judge ("IJ") on February 26, 2020. Bond was denied as the IJ found that he failed to prove he was not a danger to the community. Dubon Miranda was released from ICE custody on May 18, 2020, when his application for withholding of removal and protection under the Convention Against Torture was granted. Ajibade Thompson Adegoke, of Nigeria, was taken into ICE custody on November 18, 2019, after state theft charges against him were dropped. Thompson appeared *pro se* at a videoconferenced bond hearing but did not know what was expected of him. "The IJ did not ask him what his financial situation was, nor did she ask Mr.

53

Thompson to tell the court why he was neither a danger nor a flight risk." *Dubon Miranda v. Barr*, 463 F. Supp. 2d 632, 639 (D. Md. 2020). Bond was set at $15,000, an amount Thompson was unable to pay. On May 7, 2020, Thompson's asylum application was granted, and he was released. Jose de la Cruz Espinoza, of Mexico, was taken into ICE custody after being released on bond on state assault charges. Although Espinoza was represented by counsel at his February 19, 2020, bond hearing, the complaint alleges that his "bond hearing lasted approximately five to ten minutes, he did not know it was his burden to prove that he is not a danger to the community nor a flight risk, and he had trouble understanding what was happening due to a language barrier." *Id.* Espinoza, in ICE custody at the time of the district court's ruling, was later released on bond.

The statute governing the arrest and detention of noncitizens pending a decision on removal, 8 U.S.C. § 1226(a), provides the Attorney General with authority to detain or release an alien on bond. "Congress has given the Attorney General broad discretion to determine whether, and on what terms, an alien arrested on suspicion of being deportable should be released pending the deportation hearing." *Reno v. Flores*, 507 U.S. at 294–95. Federal regulations provide the arresting ICE officer with discretion to release an alien, "provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). After an initial custody determination has been made, the alien may "request amelioration of the conditions under which he or she may be released" by an immigration judge. *Id.* at § 1236.1(d)(1). Thereafter, an appeal

relating to bond and custody determinations may be filed with the Board of Immigration Appeals ("BIA"). *Id.* at § 1236.1(d)(3).

Formerly, the BIA took the position that "[a]n alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national security. . . or that he is a poor bail risk." *Reno v. Flores*, 507 U.S. at 295 (quoting *Matter of Patel*, 15 I. & N. Dec. 666, 666 (1976)). In 1996, Congress amended the Immigration and Nationality Act ("INA") by passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). "IIRIRA expanded a carve-out in the INA that mandated detention during removal proceedings for 'criminal aliens' with certain triggering convictions" under § 1226(c). *Velasco Lopez*, 978 F.3d at 848. With the exception of increasing the minimum bond amount, "Congress left untouched the general detention provision at issue here, 8 U.S.C. § 1226(a)." *Id.*

> Following the enactment of IIRIRA, the Immigration and Naturalization Service ("INS"), not Congress, implemented new regulations that altered the standard for the initial post-arrest custody determination made by INS officials. 8 C.F.R. § 236.1(c)(2)–(8). The new regulations established a presumption of detention and placed on the arrested individual the burden of demonstrating, to the satisfaction of the arresting officer, that release would not pose a danger to property or persons and that the individual is likely to appear for any future proceedings. *See* 8 C.F.R. § 236.1(c)(2)–(8). The regulation applies only to the initial custody determination made by the arresting officer and not to immigration judges in bond hearings. However, shortly after the new regulations were implemented, the BIA began applying the rule provided in § 236.1(c)(8) for arresting officers, including the presumption of detention, to bond hearings conducted by immigration judges under § 1226(a). *Matter of Adenji*, 22 I. & N. Dec. at 1112; *Matter of Guerra*, 24 I. & N. Dec. at 38.

*Id.* at 849. Thus, while both the statute and regulations are silent as to whether the government or the detained alien bears the burden of proof at a bond hearing before an immigration judge, BIA requires that the alien "show to the satisfaction of the Immigration Judge that he or she merits release on bond." *In re Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006). The issue in this case is whether placing that burden on the noncitizen satisfies due process.[1]

The stakes at issue here are high. Detention is essentially incarceration, but the noncitizens have far fewer procedural protections than those afforded citizens accused of crimes. Noncitizens have no right to court-appointed counsel, no Speedy Trial Act rights, and no regular right to judicial review of their incarceration. As such, they face "significantly greater obstacles to acquiring evidence than an indicted or convicted criminal defendant. In addition, because the BIA placed on [noncitizens] the burden of justifying

---

[1] 8 U.S.C. § 1226(e) states that the "Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." In *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018), the Court made clear that § 1226(e) does not preclude challenges to "the extent of the Government's detention authority under the 'statutory framework' as a whole." *Accord Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019). Nor does it "limit habeas jurisdiction over constitutional claims or questions of law." *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011); *see Demore*, 538 U.S. at 517 ("Section 1226(e) contains no explicit provision barring habeas review."). "[C]laims that the discretionary process itself was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." *Singh v. Holder*, 638 F.3d at 1202 (9th Cir. 2011) (quoting *Gutierrez-Chavez v. INS*, 298 F.3d 824, 829 (9th Cir. 2002)). Whether noncitizens receive due process "is not a matter of discretion" and is subject to judicial review. *Zadvydas*, 533 U.S. at 688.

[their] release, there was a considerable risk of error in the BIA's findings." *Velasco Lopez*, 978 F. 3d at 851.

The government argues that § 1226(a) was enacted because "many deportable aliens are not removed from the United States [because of] the inability of the INS to detain such aliens through the course of their deportation proceedings." H.R. Rep. 104-469(I), at 123 (1996). The government contends that § 1226(a) already has built in due process safeguards by its allowance of an individualized bond hearing, permittance of an administrative review, and opportunity to request a second bond hearing if there is a material change in the noncitizen's circumstances.

## II.

The Supreme Court has issued a series of decisions addressing due process challenges to various aspects of detention pending removal proceedings. But each of these cases are distinguishable and collectively they fail to provide constitutional support for the executive branch's decision to place the burden on the noncitizen at an immigration detention hearing.

In *Jennings v. Rodriguez*, the Court disagreed with the Ninth Circuit's conclusion that § 1226(a) required the Attorney General to hold bond hearings for detained aliens every six months at which the government was required to establish the need for continued detention by clear and convincing evidence. The Court concluded that "[n]othing in § 1226(a)'s text . . . even remotely supports the imposition of either of those requirements." 138 S. Ct. at 847. Importantly, however, the Court in *Jennings* was not faced with the constitutional question presented here, and only addressed whether the text

57

of § 1226(a) imposed those requirements. The Court remanded the case to the Ninth Circuit for consideration of the constitutional question. "Thus, while the Supreme Court held that § 1226(a) does not mandate that a clear and convincing evidence burden be placed on the government in bond hearings, it left open the question of whether the Due Process Clause does." *Darko v. Sessions*, 342 F. Supp. 3d 429, 434–35 (S.D.N.Y. 2018). *See Aleman Gonzalez v. Barr*, 955 F.3d 762, 781 (9th Cir. 2020) ("*Jennings*'s rejection of layering such a burden onto § 1226(a) *as a matter of statutory construction* cannot undercut . . . our constitutional due process holding in *Singh* [*v. Holder*].") (emphasis in original).

In *Zadvydas v. Davis*, the Court held that due process imposed a reasonable time limitation on detention of aliens detained beyond the 90-day statutory removal period. "In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." 533 U.S. at 689. Notwithstanding the government's plenary power in the area of immigration, the Court noted "that power is subject to important constitutional limitations." *Id.* at 695.

In *Demore v. Kim*, the Court upheld the mandatory detention of aliens convicted of certain crimes, such as aggravated felonies, under 8 U.S.C. § 1226(c). Demore, a lawful permanent resident, challenged his mandatory detention pending removal proceedings on due process grounds, arguing that government had not provided a justification for holding him without bail sufficient to overcome his liberty interest. In upholding mandatory detention for aliens who had been convicted of certain categories of crimes, the Court disagreed, noting "Congress adopted this provision against a backdrop of wholesale failure

58

by the INS to deal with increasing rates of criminal activity by aliens." 538 U.S. at 518. The Court cited evidence presented to Congress that "one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519. "[I]n adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.* at 528. The holding in *Demore*, focused as it was on the rationale for mandatory detention of criminal aliens under § 1226(c), has no application to due process considerations attendant to routine detention decisions under § 1226(a). In *Hernandez-Lara v. Lyons*, 10 F.4th 19, 36 (1st Cir. 2021), the First Circuit likewise distinguished *Demore*, concluding "[t]he circumstances here are quite different. Unlike section 1226(c), section 1226(a) applies to a wide swath of noncitizens, many of whom . . . have no criminal record at all.").

In *Carlson v. Landon*, 342 U.S. 524, 538 (1952), the Court upheld the Attorney General's authority to detain alien communists pending removal proceedings without bail. The Court noted the role played by due process in the detention decision.

> Deportation is not a criminal proceeding and has never been held to be punishment. No jury sits. No judicial review is guaranteed by the Constitution. Since deportation is a particularly drastic remedy where aliens have become absorbed into our community life, congress has been careful to provide for full hearing by the Immigration and Naturalization Service before deportation. Such legislative provision requires that those charged with that responsibility exercise it in a manner consistent with due process.

*Id.* at 537–38. The Court noted that "Congress had before it evidence of resident aliens' leadership in communist domestic activities sufficient to furnish reasonable ground for action against alien resident Communists." *Id.* at 536. As such, the Court concluded that "[t]here is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542. As in *Demore*, the Court in *Carlson* made specific findings as to the dangerousness of a class of noncitizens, and those findings were found to have justified the detention of noncitizens even in the absence of individualized determinations as to danger and flight risk. "But for the same reasons that *Demore* is a poor analog to this case, so too is *Carlson*: no similar findings regarding dangerousness or flight risk have been made as to the class of noncitizens detained under section 1226(a)." *Hernandez-Lara*, 10 F.4th at 36.

Nor is *Reno v. Flores* dispositive. *Reno v. Flores* concerned a procedural due process challenge to a regulation that denied bail to noncitizen minors who could not be released into the custody of a parent, adult relative or legal guardian. In that case, the parties agreed that INS "must assure itself that someone will care for those minors pending resolution of their deportation proceedings." 507 U.S. at 295. The Court grounded its analysis on the juvenile status of the aliens at issue, noting that "juveniles, unlike adults, are always in some form of custody." *Id.* at 302–03. The Court reasoned: "Where a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." *Id.* at 303. The Court

60

rejected the facial procedural due process challenge, stating that "due process is satisfied by giving the detained alien juveniles the *right* to a hearing before an immigration judge." *Id.* at 309. The government seizes on this statement, arguing that because every noncitizen detained under § 1226(a) may request a bond hearing, due process is satisfied. In the context of § 1226(a), I do not believe that due process is satisfied in such a *de minimis* fashion. As the First Circuit noted in *Hernandez-Lara*,

> The Court's statement, however, was simply a response to the lower courts' holding that the agency's "procedures are faulty because they do not provide for <u>automatic</u> review by an immigration judge of the initial deportability and custody determinations." Moreover, the hearings in *Flores* were governed by *Matter of Patel*, under which the government bore the burden of providing danger and flight risk.

10 F.4th at 37 (internal citations omitted).

In sum, these Supreme Court decisions do not compel the conclusion that placing the burden of proof on noncitizens in immigration detention hearings comports with due process. Rather, as the First Circuit held in *Hernandez-Lara*, and the majority opinion recognizes, the "inquiry is guided by the three-part balancing test articulated in *Mathews v. Eldridge*." *Id.* at 27 (citing 424 U.S. 319, 335 (1976)).

III.

I disagree with the majority's conclusion that placing the burden of proof on the noncitizen at § 1226(a) bond hearings meets the requirements of *Mathews v. Eldridge*. In *Mathews*, the Supreme Court stated that the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (internal quotation omitted). Due process "is flexible and calls for such procedural

61

protections as the particular situation demands." *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). As such, to determine whether due process has been afforded in a particular situation, courts usually assess three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.* at 335.

First, as to the privacy interest at stake, freedom from imprisonment and physical restraint "lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Deportation is a "drastic measure, often amounting to lifelong banishment or exile[.]" *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (internal quotations omitted); *see Bridges v. Wixon*, 326 U.S. 135, 147 (1945) ("[D]eportation may result in the loss 'of all that makes life worth living.'"). The Supreme Court has repeatedly affirmed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). For this reason, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Here, the deprivation suffered is ICE detention, which houses detainees in the same or similar conditions as criminal prisoners. JA 137, 179–80, 191–92. Moreover, detainees have a significant interest in preparing their defense against removal, and this becomes almost impossible to do under detention because of the inability to secure legal assistance or gather

62

evidence. Katherine Perino Decl., JA 082–83 ("Being unable to leave detention and find a lawyer is almost a guarantee you will be deported."). As such, the first factor cuts sharply in favor of respondents.

Second, as to the erroneous deprivation, the government argues that § 1226(a) provides sufficient safeguards to prevent the erroneous deprivation of a liberty interest. Upon review, I simply cannot agree that these procedures provide adequate safeguards. Although the *Velasco Lopez* court declined to "establish a bright-line rule for when due process entitles an individual detained under § 1226(a) to a new bond hearing with a shifted burden," *Velasco Lopez*, 978 F.3d at 855 n.13, the court acknowledged that § 1226(a) implicates a fundamental liberty right and putting the burden of proof on an alien created an impermissible risk of error. *Id.* at 851–53.

There are several reasons why placing the burden of proof on the noncitizen increases the likelihood of erroneous deprivation. First, those facing removal have no right to counsel "and very often cannot obtain counsel on their own, particularly if they are detained." *Hernandez-Lara*, 10 F.4th at 30. Second, "detained individuals will likely experience difficulty in gathering evidence on their own behalf." *Id.* Former IJ Slavin Decl., JA 095–96; Katherine Perino Decl., JA 080–81; *see Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013) (stating that detained aliens "have little ability to collect evidence"). Third, noncitizens facing removal often face a language barrier. Fourth, by definition, immigration authorities have a better grasp on immigration law and procedures than detained noncitizens. Fifth, proving the negative as to danger and risk of flight can be difficult. *See Elkins v. United States*, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it

63

is never easy to prove a negative."). "For all of these reasons, a detainee often starts out behind the eight ball in a bond proceeding, and the opportunities for prejudicial error abound." *Hernandez-Lara*, 10 F.4th at 31. Moreover, "as the period of . . . confinement grows," so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention. *Zadvydas*, 533 U.S. at 701.

Furthermore, I agree with the district court's conclusion that "erroneous deprivations of liberty are less likely when the government, rather than the noncitizen, bears the burden of proof." *Dubon Miranda*, 463 F. Supp. 3d at 646. Importantly, "the government, by and large, has access to greater resources and legal expertise," and is, therefore, usually in a better position to "access [immigration and criminal] records" as opposed to the alien. Former IJ Slavin Decl., JA 096; *see Velasco Lopez*, 978 F.3d at 853 (detailing that the government often has access to "numerous databases[,] . . . to information collected by DHS, DOJ, and the FBI, [and to] information in the hands of state and local authorities"); *J.G. v. Warden, Irwin Cnty. Det. Ctr.*, 501 F. Supp. 3d 1331, 1337 (M.D. Ga. 2020) ("The Government is not required to present a shred of evidence, yet it has substantial resources available."). By placing the burden of proof on the government, this safeguard helps balance the fact that aliens seeking release have no right to counsel, speedy trial, or cross-examination. Because "[t]he probable value . . . of [this] additional or substitute procedural safeguard[]" is significant, the second factor weighs heavily in respondents' favor. *Mathews*, 424 U.S. at 335.

As to the third *Mathews'* factor, the importance of the government's interest in ensuring that noncitizens do not abscond and commit crimes is well-established and

64

legitimate. *Velasco Lopez*, 978 F.3d at 854. "The government has legitimate interests in protecting the public and in ensuring that noncitizens in removal proceedings appear for hearings, but any detention must 'bear[ ] [a] reasonable relation to [its] purpose.'" *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (alterations in original) (quoting *Zadvydas*, 533 U.S. at 690).

> However, the Government has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight. On the contrary, shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose. . . . When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees. The Government articulates no public interest that any of this serves and we see none.

*Velasco Lopez*, 978 F.3d at 854–55. Requiring the government to bear the burden of proof at initial detention and bond hearings does not impede the government's legitimate interest. In fact, it is in the government's interest to limit the unnecessary detention of aliens deemed not to be a danger or flight risk, which would aid the government. *See* Michelle Mendez Decl., JA 092; Former IJ Slavin Decl., JA 096. "In short, given the risk that the current procedures lead to many instances of needless detention, entailing substantial social and financial costs, the public interest in placing the burden of proof on the detainee is uncertain at best, and may well be negative." *Hernandez-Lara*, 10 F.4th at 33.

In my view, the *Mathews* factors squarely support placing the burden of proof on the government to prove the noncitizen is a danger or risk of flight.

65

IV.

Other circuit courts have raised due process concerns with placing the burden of proof on noncitizens at immigration detention hearings. In *Hernandez-Lara*, 10 F.4th at 39, the First Circuit held that "the government must bear the burden of proving dangerousness or flight risk in order to continue detaining a noncitizen under section 1226(a)." Consistently, the Ninth Circuit has held that, given the substantial liberty interest at stake, noncitizens facing prolonged detention while review of their petitions for review of removal orders are pending are entitled to a bond hearing at which the government bears the burden of proving danger or flight risk, *Casas-Castrillon v. Dept. of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008), by clear and convincing evidence. *Singh v. Holder*, 638 F.3d at 1203. *See also German Santos v. Warden Pike Cty. Corr. Facility*, 965 F.3d 203, 214 (3d Cir. 2020) (holding that noncitizens detained for prolonged periods under the mandatory provisions of § 1226(c) are constitutionally entitled to a bond hearing at which the government "bears the burden of persuasion by clear and convincing evidence. That evidence must be individualized and support a finding that continued detention is needed to prevent him from fleeing or harming the community").[2]

---

[2] The Third Circuit's decision in *German Santos* followed earlier ones in immigration bond cases in *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011), and *Borbot v. Warden Hudson Cty. Corr. Facilit*y, 906 F.3d 274 (3d Cir. 2018). Unlike *German Santos* and *Diop*, which arose following prolonged mandatory detention under § 1226(c), Borbot filed a petition under 28 U.S.C. § 2241, seeking habeas review of his continued detention following his initial hearing under § 1226(a). Unlike the respondents here, Borbot did not argue that he was denied due process in his initial hearing. As such, the Third Circuit's finding that due process did not require that Borbot receive a second bond hearing has no bearing on the present case.

In *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020), the Second Circuit found detention of a noncitizen under 1226(a) for 15 months to violate due process and ordered a new bond hearing at which the government bore the burden of proving danger or risk of flight by clear and convincing evidence. "While the Government's interest may have initially outweighed short-term deprivation of Velasco Lopez's liberty interests, that balance shifted once his imprisonment became unduly prolonged. We conclude that Velasco Lopez's prolonged incarceration, which had continued for fifteen months without an end in sight or a determination that he was a danger or flight risk, violated due process." *Id.* at 855.

Consistent with these circuit court decisions, in a growing chorus of decisions, district courts from around the country have held that due process requires the government to bear the burden of proving danger or flight risk at a § 1226(a) immigration bond hearing. *See*, *e.g.*, *Pensamiento v. McDonald*, 315 F. Supp. 3d 684, 692 (D. Mass. 2018) ("[T]he Constitution requires placing the burden of proof on the government in § 1226(a) custody redetermination hearings. Requiring a non-criminal alien to prove that he is *not* dangerous and *not* a flight risk at a bond hearing violates the Due Process Clause."); *Darko v. Sessions*, 342 F. Supp. 3d at 435 ("Since *Jennings*, a number of district courts have taken up the question left open by the Supreme Court, and there has emerged a consensus view that where, as here, the government seeks to detain an alien pending removal proceedings, it bears the burden of proving that such detention is justified."); *J.G. v. Warden, Irwin Cnty. Det. Ctr.*, 501 F. Supp. 3d at 1335 ("This Court joins the Ninth and Second Circuits as well as the overwhelming majority of district courts that hold the Government must bear the

67

burden of proof to justify a noncitizen's detention pending removal proceedings.") (internal quotation omitted); *Cruz-Zavala v. Barr*, 445 F. Supp. 3d 571, 576 (N.D. Cal. 2020) ("[A]t a § 1226(a) bond hearing, the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond.") (internal quotation omitted); *Vargas v. Wolf*, No. 2:19-cv-02135-KJD-DJA, 2020 WL 1929842, at *7 (D. Nev. Apr. 21, 2020) ("In sum, the Fifth Amendment's Due Process Clause requires the government to prove a detainee's flight risk or dangerousness, by clear and convincing evidence, to justify continued detention."); *Diaz-Ceja v. McAleenan*, No. 19-cv-00824-NYW, 2019 WL 2774211, at *7 (D. Colo. July 2, 2019) ("Requiring a non-criminal alien to prove that he is not dangerous and not a flight risk at a bond hearing violates the Due Process Clause. The clear weight of authority from courts to have considered the question after the *Jennings* Court's deferral and remand of the constitutional question have come to the same conclusion.") (internal citation omitted); *Al-Sadeai v. USCIS*, 540 F. Supp. 3d 983, 991 (S.D. Cal. 2021) ("[N]oncitizens still face such a significant possible deprivation of liberty at the time of their initial bond hearing under Section 1226(a) that the Due Process Clause requires the burden of proof to justify detention to be placed on the Government . . . ."); *Onosamba-Ohindo v. Barr*, 483 F. Supp. 3d 159, 184 (W.D.N.Y. 2020) ("Due Process requires the burden of proof to be on the government at a bond hearing involving an individual detained under § 1226(a).") *But see Lopez v. Barr*, 458 F. Supp. 3d 171, 176–79 (W.D.N.Y. 2020) ("On balance, the Court concludes that Lopez's bond hearing satisfied the fundamental requirement of due process—namely, that he had the opportunity to be heard at a meaningful time and in a

68

meaningful manner.") (internal quotations omitted). *See also Portillo v. Hott*, 322 F. Supp. 3d 698, 702–10 (E.D. Va. 2018) (applying *Demore* and *Zadvydas*, the Eastern District of Virginia found the flexible nature of due process protections required an individualized bond hearing for a noncitizen detained for a prolonged period under § 1226(c) at which the government bore the burden of proof by clear and convincing evidence).

In my view, placing the burden of proof on aliens during § 1226(a) detention proceedings violates the Due Process Clause. Joining our sister circuits, I would find that in order to justify a detainee's detention, the government bears the burden of proof during § 1226(a) proceedings. Specifically, consistent with the Bail Reform Act, I would find that the government must show either that a detainee is a danger to the community by clear and convincing evidence or a flight risk by a preponderance of the evidence. *Hernandez-Lara*, 10 F.4th at 39–41. *See Velasco Lopez*, 978 F.3d at 856 ("We believe that it is improper to allocate the risk of error evenly between the individual and the Government when the potential injury is as significant as the individual's liberty. Accordingly, we conclude that a clear and convincing evidence standard of proof provides the appropriate level of procedural protection.").

The district court also concluded that due process requires the government to consider financial circumstances and alternative release considerations. I agree. "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992). As the Ninth Circuit held in *Hernandez v. Sessions*, 872 F.3d at 991, "[a] bond determination process that does not include consideration of financial circumstances and

69

alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests."

V.

The majority concludes that class-wide injunctive relief is barred by 8 U.S.C. § 1252(f)(1). Titled "[l]imit on injunctive relief," § 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–32], . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

"By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999).

There is a circuit split as to whether class-wide injunctive relief is barred by § 1252(f)(1). The First, Third, Sixth and Tenth Circuits have held that § 1252(f)(1) bars class-wide injunctive relief. *Brito v. Garland*, 22 F.4th 240, 249–50 (1st Cir. 2021); *Gayle v. Monmouth Cty. Corr. Inst.*, 12 F.4th 321, 336 (3d Cir. 2021); *Hamama v. Adducci*, 912 F.3d 869, 877 (6th Cir. 2018); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999). The District of Columbia and Ninth Circuit have read § 1252(f)(1)'s prohibition more narrowly—applying only to the "operation of the [statutory] provisions" themselves—and placing no restriction on the district court's authority to enjoin agency action found to

70

violate the Constitution. *Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020); *Padilla v. Immigr. & Customs Enf't*, 953 F. 3d 1134, 1151 (9th Cir. 2020), *vacated on other grounds by Immigr. & Customs Enf't v. Padilla*, 141 S. Ct. 1041 (2021).

The Supreme Court has not decided this issue. In *Jennings*, the Court directed that "the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims." 138 S. Ct. at 851. Plainly, the *Jennings* majority did not consider the issue to be decided. A year later, in *Nielson v. Preap*, 139 S. Ct. at 962, the Court again sidestepped the question of class-wide injunctive relief under § 1252(f)(1), stating that "we need not decide" whether the district court overstepped the bounds of § 1252(f)(1) when it "grant[ed] injunctive relief for a class of aliens that includes some who have not yet faced—but merely 'will face'—mandatory detention." As Judge Lipez stated in partial dissent in *Brito v. Garland*, 22 F.4th at 258, "[i]n the face of this history, I do not see how we can treat the issue of whether § 1252(f)(1) bars class-wide injunctive relief for individualized constitutional claims as having been resolved by the Supreme Court."

In any event, § 1252(f)(1) makes no mention of declaratory relief, and even courts that have found it to bar class-wide injunctive relief have held that it does not bar class-wide declaratory relief. *Brito v. Garland*, 22 F.4th at 252 ("[W]e conclude that declaratory relief remains available under § 1252(f)(1)."). In *Nielsen v. Preap*, 139 S. Ct. at 962, Justice Alito, joined by the Chief Justice and Justice Kavanaugh, wrote that "[w]hether the *Preap* court had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief."

71

While the plaintiffs sought declaratory relief in this case,[3] it does not appear that the district court granted declaratory relief, instead fashioning its remedy in terms of a preliminary injunction. The court concluded: "Based on the court's finding that significant constitutional rights are at stake, and the risk of irreparable harm, the court will issue a class-wide preliminary injunction mandating that § 1226(a) bond hearings implement procedures that adequately protect the due process rights of citizens." 463 F. Supp. 3d at 652.

The district court opinion does not address § 1252(f)(1), perhaps because, as respondents assert, the government did not raise the issue below. As such, respondents assert that the government has waived this argument on appeal. The government argues that § 1252(f)(1) is a jurisdictional bar, and as such cannot be waived. Regardless, the issue was not addressed in the district court, and the court was not asked to parse the issue of declaratory versus injunctive relief. At the very least, the matter should be remanded to the district court to address the government's argument first raised on appeal that § 1252(f)(1) bars class-wide injunctive relief and to determine whether, in light of that argument, class-wide declaratory relief should issue. Justice Breyer made this point clear in his dissent in *Jennings*.

> At a minimum I can find nothing in the statute or in the cases
> to which the majority refers that would prevent the respondents
> from pursuing their action, obtaining a declaratory judgment,
> and then using that judgment to obtain relief, namely, a bail
> hearing, in an individual case. Thus, I believe the lower courts

---

[3] The district court noted that "[t]he lead plaintiffs seek class certification, declaratory relief, and an order that each member of the class be released unless provided with a new bond hearing." *Dubon Miranda*, 463 F. Supp. 3d at 640.

> are free to consider the constitutionality of the relevant statutory provisions as the majority now interprets them.

138 S. Ct. at 876 (Breyer. J., dissenting).

On balance, given the government's failure to raise § 1252(f)(1) at the district court, I would remand the case to allow the district court to consider the application of that statute and whether class-wide declaratory relief is appropriate.

## VI.

While I am mindful of the executive's vast authority over immigration, it must still comport with constitutional safeguards. With this balancing in mind, requiring a detained noncitizen to prove he is not a danger to the community or risk of flight is unconstitutionally onerous on an already vulnerable group of defendants and violates due process. In sum, I respectfully dissent and would affirm the district court's conclusion that the Due Process Clause requires the government to bear the burden of proof at § 1226(a) detention hearings and remand the case to the district court for consideration of § 1252(f)(1) and the availability of class-wide declaratory relief.